UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America ) | |
| ) | |
| v.                     ) | USDC No. 21-cr-620 (BAH) |
| ) | |
| Anthony Vuksanaj, *defendant*. ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid him at his sentencing on April 29, 2022, when he appears before the Court for his sentencing hearing.

1. Defendant was charged on Oct. 6, 2021, by criminal Information with four misdemeanor offenses resulting from his involvement in the Capitol Hill protests of January 6, 2021. They were Entering and Remaining in a Restricted Building (Count One), in violation of 18 U.S.C. §1752(a)(1); Disorderly and Disruptive Conduct Which Impedes the Conduct of Government Business, in violation of 18 U.S.C. §1752(a)(2); Disruptive Conduct in the Capitol Buildings, in violation of 40 U.S.C. 5104(e)(2), and Demonstrating, Picketing or Parading in a Capitol Building, in violation of 40 U.S.C. 5105(e)(2)(G) ("Demonstrating"). On January 20, 2022, the defendant, per his plea agreement with the United States, entered a plea of guilty to Demonstrating, a petty offense which carries a maximum sentence up to six (6) months imprisonment, a fine of up to $5,000, a term of probation not to exceed five (5) years[1] and a $10 special assessment. As a petty offense, the U.S. Sentencing Guidelines do not apply. (PSR, page

---

[1] The Presentence Report ("PSR") erroneously reports a period of supervised release of up to one (1) year, not a period of probation up to five (5) years. (PSR, page 3, ¶4) However, the probation office's sentencing recommendation states correctly that supervised release is "not applicable" to this offense. (Doc. 35, page 1, March 22, 2022)

3, ¶6)  The defendant agreed to pay $500.00 in restitution toward defraying the cost of repairs to the U.S. Capitol which were required after the events.

      2.  In addition, the government required, and the defendant agreed, a post-plea debriefing of the defendant regarding both his conduct during and knowledge of the events of January 6 and his social media postings, if any. (Doc. 25, Plea Agreement, page 2, ¶3)  The defendant satisfied this condition by meeting on Feb. 1, 2022, with Asst. U.S. Attorney Alison Prout ("the government") and FBI Special Agent William Slattery.

      3.  The defendant and his counsel reviewed the draft PSR and made one objection to its assertions, that defendant denies ownership of real estate in Rogersville, Missouri. (PSR, page 14, ¶56)  Counsel returned by email, with a copy to the government, the defendant's Receipt and Acknowledgment of the draft PSR checking the box noting the objection. (Exhibit, 3 pp. attached)  That information remains in the final PSR, (Doc. 34, filed March 22, 2022), which on page 19 states erroneously that the defendant made no objections to the report as written.  Counsel surmises that the PSR writer inadvertently overlooked that objection, hence the errors.

      4.  The U.S. Probation Office has since filed its sentencing recommendation to the Court. (Doc. 35, filed March 22, 2022)  It recommends a period of three (3) probation and no period of custody or incarceration. (Id.)  The defendant concurs with this recommendation.  Below the defendant will present his argument that such a sentence is appropriate in the circumstances.

      5.  The defendant came to Washington on January 6 because reports of the election raised questions in his mind of whether it had been conducted fairly.  He hoped that the voting in the Electoral College would be delayed so that further investigation could be made into the results.  It was not partisan fervor –indeed, he reports that he is not registered in any political party nor

did he vote in the election – that spurred him to come to Washington.  Rather, it was a belief that our democracy works best when the public has confidence in its elections.  Importantly, the defendant was not a member of any violent, extremist, or disruptive group, and did not encourage others, either in person or on social media, to commit acts of violence or obstruction,

6. The defendant attended President Trump's speech on the Mall, then went with the crowd as it moved toward the Capitol.  Once there, he entered the Capitol through the Senate Wing Door.  While inside, "he walked with crowds chanting, 'Who's house? Our house'…'Nancy, Nancy,' 'You serve us,' and 'F— McConnell.'"[2] (Doc. 26, Statement of Offense," page 4, ¶11)  Through these actions he committed the offense of Demonstrating.

7. As he was trying to find his way from the building[3] the defendant found himself in a scrum of protestors who were in a standoff with police.  The police were attempting to stop the protestors' forward progress; as they did, more protestors, behind the defendant, clogged the hallway. This was "in the area of the Ohio Clock Corridor. (He) was part of that crowd and was forced back by the officers." (Id., ¶12)

8.  While in the Capitol or on its grounds, the defendant did not commit any violent or destructive acts, to persons or property.  Nor did he steal or attempt to steal items from the building, as did a number of other protestors.  In an odd way, this is not surprising: the building's beauty left him awestruck, feeling even exalted.   That probably explains why he spent as much

---

[2] The crowd's ire appears to have been with both Democrats and Republicans, given the identities of the parties called out for vituperation, believing apparently that each party contributed to an electoral debacle.

[3] He reports that after he'd been inside the Capitol for a few minutes, he received a phone call from his wife, who had been watching live TV coverage of the protests outside the Capitol. He learned from her about the violence that was taking place there; she urged him to leave the building.  It was after the call that he made his attempts to find a way out.

time in the Capitol – about forty minutes – as he did.  He left the building without incident and returned to his home in New York state that evening.

9.  The Court must consider, under 18 U.S.C. §3553(a) the following factors: (a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

10. The defendant is confident that with the information already submitted, the Court already has a considerable understanding of "the nature and circumstances of the offense and the history and characteristics of the defendant."  Defendant is a fifty-two year old male who has lived his entire life in New York state.  He is married and has two adult daughters.  His employment history, which began in his late adolescence (age 15), was as a laborer for Temco Services Industries, Inc.  He worked there for twenty-seven (27) years, from 1984 to 2011. (PSR, page 12, ¶50)  It was in 2011 that he became permanently disabled from a serious vehicle acciden. (Id.) He has been disabled since. He takes a number of prescription medicines for pain management related to injuries to his back, neck and knee. (PSR, pages 11-12, ¶43)

12. Defendant has several criminal convictions. The most serious appears to be from an arrest more than thirty years ago for "Criminal Possession Loaded Firearm Third Degree,"[4] Following conviction after trial on May 15, 1992, a one (1) year sentence (concurrent) was imposed on Aug. 13, 1992. (PSR, page 6, ¶24.) The defendant does not dispute the arrest, and recalls that he was found guilty in a bench trial, but that the conviction was later reversed. He reports that the case was rebrought as misdemeanor Fourth Degree Criminal Possession on June 6, 1992, and remembers it being dismissed. In any event, even if his memory is faulty and the case resulted in a conviction, it would have been for a misdemeanor, not a felony, as he believes the case following appeal was charged as a Fourth Degree possession.[5] With respect to the 2019 arrests which are listed (PSR page 8-9, ¶¶30 and 31), both were resolved with guilty pleas, followed by a "conditional discharge." Defendant believes these were the products of what is often known as a 'deferred sentencing" agreement, which requires a plea of guilty and results in a dismissal of the charge(s) after the defendant meets certain conditions for a fixed period of time.[6] Finally, the defendant understood that the dismissal of the charge from his arrest on June 6, 2021, was the product of his having been ruled out as a perpetrator based on forensic evidence

---

[4] New York State Penal Code §265.02

[5] New York State Penal Code §265.01, a misdemeanor. The one year concurrent sentence, which would have run with the Fourth Degree criminal possession sentence of 90 days (PSR page 7, ¶25) imposed on Oct. 20, 1992, two months later, suggests that the defendant was convicted of a lesser-included misdemeanor offense. Given the number of firearms found in the residence during the execution of the search, it seems that the defendant would have been charged under 18 U.S.C. §922(g) had there been a legal basis (i.e., a prior felony conviction) for doing so. That he wasn't may indicate that the defendant does not have a conviction for the 1990 arrest that's listed as Third Degree Criminal Possession Loaded Firearm, a felony under New York State Penal Code 265-02.

[6] In contrast to a deferred prosecution agreement, which does not involve an admission of guilty but compliance with certain conditions for a fixed period of time following the entry of the agreement. A *nolle prosequi* would be entered following completion of the terms. The defendant will attempt to obtain clarifying information before sentencing.

obtained during the investigation, not because a witness "declined to proceed." (Govt. sentencing memo, page 19)

11. A lengthy period of probation would satisfy the "need for the sentence…to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." During this time, the defendant would be answerable to the U.S. Probation Office. He would be subject to the jurisdiction of the Court and know that any infraction could lead to revocation of the probationary term, with incarceration to follow. Such a term would at the same time provide deterrence specific to the defendant, operating as a disincentive to further criminal behavior.

12. A lengthy term of probation would also deter generally. The public is aware from the comprehensive coverage of the January 6 events and the arrests that followed of the serious efforts the government has made to prosecute persons involved with the protests and, what in many cases, the violence that followed. Indeed, reporting in the defendant's locality, in newspapers and television, has identified the defendant as having been arrested. This media attention will continue, one presumes, through the defendant's sentencing. The public will be aware of the defendant's responsibility for his conduct, which will serve to deter others in the future in similar situations.

13. Given the defendant's disability and his continued reliance on medication, a non-custodial sentence might better assure his continued medical needs instead of an institutional setting.

14. The defendant submits that a probationary term would satisfy the various §3553 factors. The Court could also if it believes it appropriate for the defendant to provide community

service. The defendant might be able to serve his community, consistent with any limitations caused by his disability. Last, in the event that this Court believes that incarceration, not probation, is appropriate, defendant requests that he be able to serve his time in home confinement.

       This pleading is,

                      Respectfully submitted,

                           /s/

                     NATHAN I. SILVER, II
                     Unified Bar #944314
                     6300 Orchid Drive
                     Bethesda, MD 20817
                     (301) 229-0189 (direct)
                     (301) 229-3625 (fax)
                     email: nisquire@aol.com


CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on Alison Prout, Esq., asst. U.S. Attorney for the Northern District of Georgia, this 8th day of April, 2022.

                       /s/
                  _____
                  *Nathan I. Silver, II*